**GARBARINI FITZGERALD P.C.**
420 Lexington Ave.
Suite 2743
New York, New York 10170
Telephone: (212) 300-5358
Facsimile: (888) 265-7054

Richard M. Garbarini (RG 5496)
rgarbarini@garbarinilaw.com
Thomas FitzGerald (TF 2426)
tfitzgerald@garbarinilaw.com
Latrisha Desrosiers (LD 6971)

*Attorneys for Plaintiffs*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
GILBERT CARANDANG and MARIA ROSARIO
CARANDANG,

                         Plaintiffs,

                v.

ROBERT SHAPIRO, LAURA SHAPIRO,
ALEXANDRA SHAPIRO, WHEN IT'S CHILE
IT'S HOT, INC. d/b/a FLEX MUSSELS, PEI
MUSSEL KITCHEN, LLC d/b/a FLEX MUSSELS,
GRAND CENTRAL ZOCALO, LLC d/b/a
ZOCALO, CITY OF NEW YORK and POLICE
OFFICER WILLIAM MASSI,

                      Defendants.
-----------------------------------------------------------x

Case No.: 12-cv-5634 (PAC)(AJP)

ECF CASE

**SECOND AMENDED COMPLAINT
AND JURY DEMAND**

      Plaintiffs Gilbert Carandang ("CARANDANG") and Maria Rosario Carandang

("ROSARIO") by and through their attorneys at GARBARINI FITZGERALD P.C., as and for their

Second Amended Complaint and Jury Demand against Robert Shapiro, Laura Shapiro,

Alexandra Shapiro, When It's Chile It's Hot, Inc. d/b/a Flex Mussels, PEI Mussel Kitchen, LLC

d/b/a Flex Mussels, Grand Central Zocalo, LLC d/b/a Zocalo, City of New York and Police

Officer William Massi allege upon personal knowledge as to themselves, and upon information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1.      Flex Mussels and Zocalo are casual dining restaurants.  Flex Mussels has two locations, one on the Upper East Side of Manhattan and one in Union Square.  Zocalo has one location, in Grand Central Terminal, which is currently the subject of an on-going dispute with the New York City Metropolitan Transit Authority.  The Flex Mussels uptown location is predominantly owned by Laura Shapiro.  The Flex Mussels downtown location is predominantly owned by Robert Shapiro and Laura Shapiro.  Zocalo is owned in its entirety by Robert Shapiro and Laura Shapiro.

2.      The restaurants are 100% owned by the Defendants ROBERT SHAPIRO, LAURA SHAPIRO, and ALEXANDRA SHAPIRO and together with the corporate Defendants constitute the "FLEX DEFENDANTS."

3.      Plaintiff CARANDANG brings this action, among other bases, pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA") to remedy violations of the wage-and-hour provisions of the FLSA by the FLEX DEFENDANTS, that have deprived CARANDANG of his lawful overtime wages, as well as the retaliation provision 29 U.S.C. § 215.

4.      Plaintiff CARANDANG also brings this action for unpaid wages, including but not limited to unpaid overtime and spread-of-hours wages, pursuant to the New York Labor Law Article 6, §§ 190 *et seq*. and Article 19, §§ 650 *et seq*., and the supporting New York State Department of Labor Regulations, 12 N.Y.C.R.R. Part 142 ("New York Labor Law").

5.     Plaintiff CARANDANG also brings a claim pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., to remedy harassment based on CARANDANG's national origin and sex that was sufficiently severe or pervasive to alter the conditions of the CARANDANG's employment and create an abusive working environment.  The incidents of harassment were more than episodic; they were sufficiently continuous and concerted to be deemed pervasive.  CARANDANG was then retaliated against for filing a charge with the EEOC on December 9, 2011.

6.     On December 9, 2011 a Complaint and Jury Demand was filed in this Court by Plaintiff CARANDANG claiming unpaid wages under the FLSA and New York State Labor Law, entitled *Carandang v. Robert Shapiro, et al.*, 11-cv-8994 (S.D.N.Y. 2011).  An Amended Complaint in that matter was filed on December 15, 2011.  Almost immediately after the Amended Complaint was served on Defendants, LAURA SHAPIRO, in concert with the other FLEX DEFENDANTS, retaliated in the most nefarious and vicious attack possible—by filing fraudulent criminal charges against CARANDANG which resulted in CARANDANG being incarcerated for six days, including over the Christmas holiday.

7.     The retaliation had its intended effect; CARANDANG withdrew his FLSA Complaint without prejudice while the bogus criminal charges were pending.

8.     CARANDANG was incarcerated based solely on a spreadsheet provide by LAURA on behalf of the FLEX DEFENDANTS.  OFFICER MASSI and the CITY OF NEW YORK filed a criminal complaint with no probable cause and the CITY OF NEW YORK continued to prosecute the action after knowing the charges against CARANDANG were fictitious.  CARANDANG brings a claim under 42 U.S.C. § 1983 and state law claims against

OFFICER MASSI and the CITY OF NEW YORK for false arrest, false imprisonment and malicious prosecution.

9.    CARANDANG spent nearly eight months tortured by the fake charges, until they were finally dismissed on July 17, 2012. CARANDANG also brings state law claims for Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Malicious Prosecution, Abuse of Process and False Imprisonment. CARANDANG's wife, Plaintiff ROSARIO, brings a state law claim for Negligent Infliction of Emotional Distress for the fear of her physical safety and well-being engendered by the intrusion into her home of armed police officers and the subsequent search of her home, resulting from the FLEX DEFENDANTS' fraudulent criminal charges against CARANDANG.

10.    The dehumanization and torture of CARANDANG and his wife, in direct response to the filing of an FLSA and/or Title VII claim, represents the harshest form of retaliation possible.

## JURISDICTIONAL PREREQUISITES

11.    Plaintiffs have satisfied all jurisdictional prerequisites for bringing this action.

12.    On December 9, 2011 a charge was filed with the Equal Employment Opportunity Commission ("EEOC") against the same ROBERT SHAPIRO and the FLEX RESTAURANT GROUP. On June 25, 2012, the EEOC issued a "Right to Sue" letter, which is attached as **Exhibit A**. A complaint was filed with this Court within 90 days from the issue of the Right to Sue letter.

13.    The criminal charges against CARANDANG were dismissed on July 17, 2012.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

15.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) (district where all defendants reside) and (b)(2) (district in which a substantial part of the events or omissions giving rise to the claims occurred).

16.    At all times relevant to this Second Amended Complaint, Plaintiff CARANDANG and each of the FLEX DEFENDANTS were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

17.    The overtime wage provisions set forth in §§ 201 *et seq.* of the FLSA apply to each of the FLEX DEFENDANTS.

18.    Plaintiff ROSARIO's claims arise from the exact same nucleus of facts giving rise to the retaliation claims of CARANDANG and are properly before this Court pursuant to 28 U.S.C. § 1367.

## PARTIES

19.    Plaintiff GILBERT CARANDANG ("CARANDANG") is a resident of Queens, New York and was at all relevant times employed by the FLEX DEFENDANTS in the City and County of New York.

20.    Plaintiff MARIA ROSARIO CARANDANG ("ROSARIO") is the wife of CARANDANG and a resident of Queens, New York.

21.    Defendant ROBERT SHAPIRO ("ROBERT") is a resident of New York and at all times relevant to this Second Amended Complaint was the Co-owner, Operator and/or Managing Member of Defendants WHEN IT'S CHILE IT'S HOT INC. d/b/a FLEX MUSSELS,

PEI MUSSEL KITCHEN, LLC d/b/a FLEX MUSSELS and GRAND CENTRAL ZOCALO, LLC d/b/a ZOCALO.

22.    Defendant LAURA SHAPIRO ("LAURA") is a resident of New York and at all times relevant to this Second Amended Complaint, the Co-owner, Operator, Managing Member and/or President of Defendants WHEN IT'S CHILE IT'S HOT INC. d/b/a FLEX MUSSELS, PEI MUSSEL KITCHEN, LLC d/b/a FLEX MUSSELS and GRAND CENTRAL ZOCALO, LLC d/b/a ZOCALO.

23.    Defendant ALEXANDRA SHAPIRO ("ALEXANDRA") is a resident of New York and at all times relevant to this Second Amended Complaint the Co-owner, Operator and/or Managing Member of Defendants WHEN IT'S CHILE IT'S HOT INC. d/b/a FLEX MUSSELS, PEI MUSSEL KITCHEN, LLC d/b/a FLEX MUSSELS and GRAND CENTRAL ZOCALO, LLC d/b/a ZOCALO.

24.    WHEN IT'S CHILE IT'S HOT INC. d/b/a FLEX MUSSELS ("FLEX UPTOWN") is a corporation formed under the laws of the State of New York and the corporate owner of the Flex Mussels restaurant located at 174 East 82nd St., New York, New York.  FLEX UPTOWN is 70% owned by LAURA SHAPIRO.

25.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant ROBERT through his operation and management of FLEX UPTOWN, maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

26.    At all times material hereto, ROBERT participated in, assisted in, supervised, guided and totally controlled FLEX UPTOWN in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, FLEX UPTOWN was the

"alter ego" of ROBERT and was dominated, controlled and supervised by ROBERT to such a degree that it had no independent ability to function.

27.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant LAURA through her operation and management of FLEX UPTOWN, maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

28.    At all times material hereto, LAURA participated in, assisted in, supervised, guided and totally controlled FLEX UPTOWN in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, FLEX UPTOWN was the "alter ego" of LAURA and was dominated, controlled and supervised by LAURA to such a degree that it had no independent ability to function.

29.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant ALEXANDRA through her operation and management of FLEX UPTOWN, maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

30.    At all times material hereto, ALEXANDRA participated in, assisted in, supervised, guided and totally controlled FLEX UPTOWN in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, FLEX UPTOWN was the "alter ego" of ALEXANDRA and was dominated, controlled and supervised by ALEXANDRA to such a degree that it had no independent ability to function.

31.    PEI MUSSEL KITCHEN, LLC d/b/a FLEX MUSSELS ("FLEX DOWNTOWN") is a limited liability company formed under the laws of the State of New York

and is the corporate owner of the Flex Mussels restaurant located at 154 West 13th St., New York, New York.

32.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant ROBERT was, and is, the Managing Member, and through his operation and management of FLEX DOWNTOWN, maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

33.    At all times material hereto, ROBERT participated in, assisted in, supervised, guided and totally controlled FLEX DOWNTOWN in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, FLEX DOWNTOWN was the "alter ego" of ROBERT and dominated, controlled and supervised by ROBERT to such a degree that it had no independent ability to function.

34.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant LAURA was, and is, a Managing Member and through her operation and management of FLEX DOWNTOWN, maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

35.    At all times material hereto, LAURA participated in, assisted in, supervised, guided and totally controlled FLEX DOWNTOWN in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, FLEX DOWNTOWN was the "alter ego" of LAURA and dominated, controlled and supervised by LAURA to such a degree that it had no independent ability to function.

36.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant ALEXANDRA through her operation and management of FLEX

DOWNTOWN, maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

37.    At all times material hereto, ALEXANDRA participated in, assisted in, supervised, guided and totally controlled FLEX DOWNTOWN in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, FLEX DOWNTOWN was the "alter ego" of ALEXANDRA and dominated, controlled and supervised by ALEXANDRA to such a degree that it had no independent ability to function.

38.    GRAND CENTRAL ZOCALO, LLC d/b/a ZOCALO ("ZOCALO") is a limited liability company formed under the laws of the State of New York and is the corporate owner of the Zocalo restaurant located at 109 East 42nd St., New York, New York.  ZOCALO is owned 99% by LAURA and 1% by ROBERT.

39.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant ROBERT through his ownership, operation and management of ZOCALO, maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

40.    At all times material hereto, ROBERT participated in, assisted in, supervised, guided and totally controlled ZOCALO in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, ZOCALO was the "alter ego" of ROBERT and dominated, controlled and supervised by ROBERT to such a degree that it had no independent ability to function.

41.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant LAURA through her ownership, operation and management of ZOCALO,

maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

42.    At all times material hereto, LAURA participated in, assisted in, supervised, guided and totally controlled ZOCALO in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, ZOCALO was the "alter ego" of LAURA and dominated, controlled and supervised by LAURA to such a degree that it had no independent ability to function.

43.    Upon information and belief, at all times relevant to this Second Amended Complaint, Defendant ALEXANDRA through her operation and management of ZOCALO, maintained control, oversight, and direction over the operation of its facilities, including its employment practices, with respect to CARANDANG.

44.    At all times material hereto, ALEXANDRA participated in, assisted in, supervised, guided and totally controlled ZOCALO in its decision making, financing and other affairs.  At all times relevant to this Second Amended Complaint, ZOCALO was the "alter ego" of ALEXANDRA and dominated, controlled and supervised by ALEXANDRA to such a degree that it had no independent ability to function.

45.    At all times material to this Second Amended Complaint, Defendants FLEX UPTOWN, FLEX DOWNTOWN, and ZOCALO (referred to here as the "FLEX RESTAURANT GROUP") functioned as a single entity under the control of the individual defendants with shared core facilities including management, accounting, human resources, food and beverage and supplies.

46.    Employees of FLEX UPTOWN, FLEX DOWNTOWN and ZOCALO would routinely move between the various restaurants.

47.    The individual restaurants in the FLEX RESTAURANT GROUP shared more than just employees.  For example, the sauces for the Flex Mussels restaurants were often made at the Zocalo restaurant.

48.    The FLEX RESTAURANT GROUP was and is, at all material times a single entity for all purposes germane to the Second Amended Complaint.  A single entity, as described below, which is merely the "alter-ego" of ROBERT, LAURA and ALEXANDRA.

49.    The CITY OF NEW YORK was and is, at all material times, a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

50.    Defendant, CITY OF NEW YORK, maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, the CITY OF NEW YORK.

51.    On December 21, 2011 and at all times relevant hereto, Police Officer WILLIAM MASSI ("OFFICER MASSI") was a resident of the State of New York and resided in New York County.

52.    On December 21, 2011 and at all times relevant hereto, OFFICER MASSI was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and according to his official duties.

53.    On December 21, 2011 and at all times relevant hereto, OFFICER MASSI was acting under the color of law.

54.     At all times relevant hereto, the Defendants acted jointly and in concert with each other.

### ROBERT, LAURA and ALEXANDRA's
### CONTROL OVER THE FLEX RESTAURANT GROUP

55.     At all times material hereto, ROBERT, LAURA and ALEXANDRA treated the FLEX RESTAURANT GROUP like their own personal piggy bank.

56.     In fact, in a previous matter filed in this Court under the FLSA entitled *Brown et al. v. Robert Shapiro et al.*, 11-cv-09419, ROBERT, LAURA and ALEXANDRA conceded individual liability for the corporate entities named herein.

57.     At all times material hereto, ROBERT maintained an American Express Corporate Card in the name of each of the corporate Defendants which he used for his own personal expenses.  ROBERT, in fact, ran up significant personal charges each month on the cards which were paid by the FLEX RESTAURANT GROUP.

58.     At all times material hereto, LAURA maintained an American Express Corporate Card in the name of each of the corporate Defendants which she used for her own personal expenses.  LAURA, in fact, ran up significant personal charges each month on the cards which were paid by the FLEX RESTAURANT GROUP.

59.     At all times material hereto, ALEXANDRA maintained an American Express Corporate Card in the name of each of the corporate Defendants which she used for her own personal expenses.  ALEXANDRA, in fact, ran up significant personal charges each month on the cards which were paid by the FLEX RESTAURANT GROUP.

60.     At all times material hereto, ROBERT and LAURA's daughter Rachel Shapiro, who at no time was an employee of any of the corporate Defendants, maintained an American Express Corporate Card in the name of WHEN IT'S CHILE IT'S HOT and Warren Business

Services which she charged her personal expenses. These expenses were paid by the FLEX RESTAURANT GROUP.

61.    At all material times, in addition to her salary, LAURA received between $2,500 and $7,500 per week by check from the FLEX RESTAURANT GROUP. This money was recorded on the books of the corporate Defendants as "Loan to Shareholder." The "Loans to Shareholders," of course, were never paid back.

62.    LAURA regularly directed CARANDANG to withdraw funds by checks drawn to CARANDANG, which were either given to LAURA personally or deposited into LAURA's personal checking account at TD Bank. LAURA would instruct CARANDANG to wire money from the corporate Defendants' bank account to her personal bank account at Bank of Nova Scotia in Canada.

63.    At all material times, in addition to her salary, ALEXANDRA received between $2,500 and $3,500 per week by check which was also charged as a "Loan to Shareholder" to the various Defendants. The "Loans to Shareholders," of course, were never paid back.

64.    LAURA, ALEXANDRA and Zachary Young would often sign the name of ROBERT on bank checks written to themselves, to be used for their own benefit.

65.    ROBERT also entered into a "Loan" agreement whereby FLEX DOWNTOWN would receive funds from FLEX UPTOWN and ZOCALO to cover the construction costs and initial costs for FLEX DOWNTOWN. These loans were not credited to FLEX UPTOWN or ZOCALO but as the personal investment of ROBERT and LAURA on the general ledger for FLEX DOWNTOWN.

66.    At all material times to this Second Amended Complaint, the personal living expenses of ROBERT's mother Elaine Shapiro, including the monthly common charges for

Elaine Shapiro's condominium and for the caregiver for Elaine Shapiro, were paid, at the direction of ROBERT, through the operating accounts of FLEX UPTOWN and ZOCALO.

67.     At all times material to this Second Amended Complaint, ALEXANDRA had her rent paid through the corporate defendants, and when she needed spending money while on vacation in Florida, ALEXANDRA simply called New York and directed CARANDANG to deposit checks into her account.

68.     ROBERT and LAURA are the sole owners of a St. Thomas Virgin Island's entity called Tropical Customs d/b/a Warren Business Services.

69.     Warren Business Services is in the business of importing and exporting goods into and from the Virgin Islands.  Warren Business Services performs no services which inure any benefit to the FLEX RESTAURANT GROUP.

70.     At all material times to this Second Amended Complaint, and at the direction of ROBERT and LAURA, the FLEX RESTAURANT GROUP paid for the American Express charges incurred by Warren Business Services, for the benefit of the SHAPIROs and Warren Business Services.

71.     At all material times to this Second Amended Complaint, and at the direction of ROBERT and LAURA, the FLEX RESTAURANT GROUP also paid for those Warren Business Services American Express Cards used by ROBERT, LAURA and the Defendants' daughter Rachel Shapiro.  The charges by Rachel Shapiro, paid for by the FLEX RESTAURANT GROUP, are solely personal.

72.     LAURA had her non-corporate credit cards paid for by the corporate Defendants, and routinely had cash delivered to her for her personal use.

73.     At no time was there any separation in the funds belonging to the FLEX RESTAURANT GROUP and the personal funds of Defendants ROBERT, LAURA, and ALEXANDRA.

74.     ROBERT, LAURA, ALEXANDRA and Rachel Shapiro hold Platinum, Plum and Green American Express Cards in the name Warren Business Services.  These charge cards are used for the personal expenses of the individuals and the monthly charges are paid through the various members of the FLEX RESTAURANT GROUP.

## PLAINTIFFS' FACTUAL ALLEGATIONS

75.     Plaintiff CARANDANG was hired as a bookkeeper at the FLEX RESTAUARANT GROUP on or about February 17, 2010.

76.     On September 26, 2011, CARANDANG was called to a meeting with ROBERT, at which time ROBERT terminated CARANDANG effective on October 7, 2011 and requested that CARANDANG assist bookkeeper Angela Letra and train bookkeeper Bridgette Dalmas.

77.     At the September 26, 2011 meeting, ROBERT also told CARANDANG that, should CARANDANG file any case, CARANDANG should "expect to go back to jail."

78.     CARANDANG's last day of employment was October 7, 2011.

79.     CARANDANG originally answered an advertisement placed on Craigslist by Defendants for a General Manager position.

80.     CARANDANG submitted a resume which was reviewed by Defendants and CARANDANG was offered an interview for the General Manager position.

81.     CARANDANG was not offered the General Manager position, but was offered a position as a bookkeeper with the intent that at some point he would be promoted to the exempt-General Manager position.

82.    CARANDANG was paid per hour for the first pay period at the rate of $35 per hour and then was paid at the rate of $20 per hour from February 25, 2010 through September 12, 2010.

83.    CARANDANG received paychecks from all three corporate Defendants.

84.    CARANDANG was kept off of payroll until January of 2011 in an attempt by Defendants to avoid payroll taxes.

85.    In or about January of 2011, CARANDANG was paid through the payroll for GRAND CENTRAL ZOCALO, WHEN IT'S CHILE IT'S HOT and PEI MUSSEL KITCHEN, and his compensation was subject to all lawful deductions and payroll tax.

86.    The payroll checks would alternate between the corporate defendants each week, paying CARADANG as an employee exempt from overtime provisions of the FLSA.

87.    Plaintiff CARANDANG physically worked at the FLEX UPTOWN location from February 17, 2010 until in or about May of 2010, at which time he was transferred to the unfinished FLEX DOWNTOWN location, an active construction site at that time.

88.    Consistent with Defendants' pattern or practice, CARANDANG would regularly work in excess of 40 hours per week without being paid overtime wages.

89.    Beginning in or about April of 2010, CARANDANG was required to clock in and out each day, and clocked in and out each day until his termination in October of 2011.

90.    CARANDANG worked most often five days per week and occasionally six days per week.  CARANDANG would also work from home because Defendants would continue to give CARANDANG work even after he left the workplace.

## HOURS AND PAY

91.    From February 17, 2010 through the second of week of March of 2010, CARANDANG's scheduled hours were 12:00 p.m. until 8:00 p.m., five days per week. CARANDANG worked through all breaks and ate at his desk while he worked. CARANDANG was paid $800 per week, at the rate of $20.00 per hour for 40 hours per week.

92.    From the third week of March 2010 through the second week of April of 2010, CARANDANG was required to report to work at 10:00 a.m. and worked until between 7:00 and 8:00 p.m. each day, five days per week. CARANDANG worked through all breaks and ate lunch at his desk while he worked. CARANDANG worked 55–60 hours per week for this three week period, but was still paid $800 per week. CARANDANG was not paid overtime or spread-of-hours pay during this period.

93.    In the first week of May of 2010, CARANDANG was required to work at the 13th Street location until his termination in October of 2011. During this period, his hours were changed, requiring him to report to work between 8:30 a.m. and 9:00 a.m. and work until at least 8:00 p.m. each day. CARANDANG worked through his lawful break-time and ate lunch while he worked. CARANDANG worked between 60 and 65 hours per week yet was still was paid $800 per week. At no time was CARANDANG paid overtime, spread-of-hours, or break time pay for this period.

94.    In the few instances CARANDANG came into work after 9 a.m., he would be greeted by e-mail from ROBERT, LAURA and/or William Lee wanting to know where he was and why he was late.

95.    On September 13, 2010, CARANDANG's salary was increased to $25.00 per hour due to increased responsibilities for FLEX DOWNOWN. CARANDANG, however, was

still paid for only 40 hours per week, or $1,000 per week. CARANDANG worked 60–65 hours

per week from May 2010 through his termination in October of 2011.

## CARANDANG WAS AN EMPLOYEE

96.     Defendants have shockingly claimed CARANDANG was not an employee. This

is completely false and not supported by prevailing law.

97.     CARANDANG worked as a bookkeeper.

98.     CARANDANG was not in business for himself.

99.     Defendants provided instructions as to when CARANDANG's work was to be

completed.

100.    The Defendants provided instructions as to where and how CARANDANG's

work was to be performed.

101.    CARANDANG was required to report to the Defendants on a regular basis.

102.    CARANDANG was required to work an established work schedule.

103.    CARANDANG was required to submit reports.

104.    The Defendants reviewed and/or inspected CARANDANG's work on a daily

basis.

105.    The Defendants provided CARANDANG with an office, computer, stationary

and guidance which he needed to perform his services.

106.    The Defendants reimbursed CARANDANG for expenses incurred while

performing his services such as purchase of paper supplies, printer cartridges and mailing

expenses.

107.    The Defendants provided training to help CARANDANG perform his services.

108.    CARANDANG could not take time off without the knowledge or approval of the Defendants.

109.    The Defendants established CARANDANG's rate of pay at $20 per hour from February 25, 2010 to September 12, 2010 and $25 per hour from September 13, 2010 to time of termination in October of 2011.

110.    CARANDANG was clearly an employee, and Defendants used the false assertion that he is not an employee to discourage CARANDANG from filing an FLSA claim.

## CARANDANG'S POSITION WAS MISCLASSIFED

111.    CARANDANG's job duties as bookkeeper were predominantly data entry, and required no application of accounting principles.

112.    On a daily basis, CARANDANG would log onto the online banking to make sure that Defendants received the sales receipts from the credit card companies; ensure the credit card receipts were signed and matched the order checks; make sure the cash was properly recorded from each restaurant; and record vendor invoices in QuickBooks.

113.    CARANDANG did not even have the discretion to pay a bill without the approval of ROBERT, LAURA, ALEXANDRA, Joseph Scalice, Jennifer Gavino or Zachary Young.

114.    CARANDANG was also tasked with changing the deductions of employees, without the employees' consent, in order to reduce payroll taxes.  Attached as **Exhibit B** is a true and correct copy of an e-mail from LAURA dated June 8, 2011 instructing CARANDANG to increase the deductions and mark the employees as married, without the employees consent, because "the taxes are too high."

115.    This required no independent judgment on the part of CARANDANG, simply data input.

19

116.    No employees reported to CARANDANG.

117.    In addition, CARANDANG's duties from March of 2010 until the first week of April of 2010 included altering payroll reports to indicate FLEX RESTAURANT GROUP's employees worked no more than 40 hours per week.  At all times relevant to this Second Amended Complaint, any employee that worked in excess of 40 hours would have the overtime qualifying hours eliminated.  This required simple deduction in the Squirrel and/or ALOHA programs.

118.    In April of 2010, Robert Shapiro sent an e-mail to CARANDANG informing CARANDANG that only managerial employees should be fraudulently changing the hours for the employees.  This task was then performed by ALEXANDRA, and other managerial employees.

119.    This included changing the hours of the kitchen employees even though the kitchen employees were paid by shift.

120.    No advanced knowledge or even a college degree was necessary for the tasks CARANDANG was assigned.

121.    In fact, at all times relevant to CARANDANG's employment, CARANDANG was not assigned any discretionary tasks.

122.    From March of 2010 through June of 2011, William Lee, the Defendants' accountant, sent various employees to do work alongside CARANDANG.

123.    These employees included Chi Chung, Jason Lee and Nancy Lu, all of whom were not college graduates; in fact, they were all in college.

124.    Chi Chung, Jason Lee and Nancy Lu performed job tasks identical to CARANDANG's.

125.    Chi Chung, Jason Lee and Nancy Lu were paid on an hourly basis.

126.    In or about June of 2011, Defendants hired Angela Letra to perform the identical job duties of CARANDANG.

127.    Letra was a wine and liquor saleswoman to restaurants and bars prior to working for Defendants.

128.    Upon information and belief, Letra had no bookkeeping experience prior to working for Defendants.

129.    From June of 2011 through October of 2011, Letra was paid by hour at the rate of $20 per hour.

130.    While Letra was paid by the hour for doing identical tasks, CARANDANG was treated as an exempt employee in the same position.

131.    In the time CARANDANG was employed by Defendants, he missed only seven days of work due to illness.  CARANDANG was docked pay for any days missed.

132.    If CARANDANG did not work, he was not paid for that day.

133.    In December of 2010, CARANDANG missed work due to illness. CARANDANG was docked pay for those days, even though CARANDANG worked from home.  CARANDANG has never been paid for this time.

134.    Starting on February 25, 2010, CARANDANG was paid $800 per week, with the promise from Robert Shapiro that CARANDANG would receive additional compensation on subsequent payrolls for overtime hours worked.

135.    From March of 2010 through September of 2011, Robert Shapiro and Alexandra Shapiro would, approximately once per month, give CARANDANG an additional paycheck for the overtime hours worked.

136.    From March of 2010 through September of 2010, the additional check was for $800.

137.    From the third week of September of 2010 through October of 2011, the additional check was for $1,000, and would not be cut through the payroll system, but drawn on the regular operating account.

138.    The check was for the additional hours worked.

139.    The payment for overtime hours worked through non-payroll checks is not unique to CARANDANG.

140.    For example, checks for Laura Petraceau, chef, and Kiyomi McCloskey, bartender, were also given non-payroll checks. Neither employee had social security identification numbers which would have allowed them to work in the United States. Both are residents of Canada, and both were illegally paid on a shift basis.

## HOSTILE WORK ENVIRONMENT

141.    About one month after CARANDANG was hired, ROBERT started a pattern and practice of constant verbal abuse denigrating CARANDANG's appearance, religion, national origin, and race.

142.    Sometime in May of 2010, when CARANDANG was moved to the construction site on 13th Street, SHAPIRO told CARANDANG, "You Asians don't care about the smell," or "It's filthy in here, you Asians are used to this."

143.    After CARANDANG was moved to the 13th Street location, SHAPIRO typically made daily comments regarding CARANDANG's race, including "Why are you slow? Is that a Filipino thing?" or "Why are Filipinos so slow?"

22

144.    ROBERT's response to questions by CARANDANG was often "Figure it out, stupid." ROBERT's constant berating regarding CARANDANG's Filipino background and statements that Filipinos are slow and stupid was humiliating.

145.    Starting in April of 2010, ROBERT began denigrating CARANDANG and his appearance saying things like "Why are you a lazy slob?" and making comments regarding CARANDANG's "big butt."

146.    When CARANDANG requested time off for Catholic religious events, CARANDANG was ridiculed by ROBERT.

147.    Sometime in September 2011, Bridgette Dalmas, the other bookkeeper at the FLEX RESTAURANT GROUP also began commenting on CARANDANG's appearance, saying "Your face is a dump." After CARANDANG got mad at Dalmas, ROBERT intervened, saying "Why are you mad? You are ugly anyway." This made it acceptable for co-workers to make comments about CARANDANG.

148.    The comments made by ROBERT and other workers were humiliating. CARANDANG often asked ROBERT to stop making the comments, but that only increased the frequency. In front of other workers ROBERT would often say "Let me deal with this freak" (referring to CARANDANG).

149.    Most humiliating was the touching of CARANDANG's posterior by ROBERT. Nearly every time ROBERT and CARANDANG were physically together, ROBERT would touch or grab CARANDANG's posterior. CARANDANG felt belittled and offended by this, and made it clear to ROBERT that he should stop touching CARANDANG. At no time did ROBERT stop the unwanted touching of CARANDANG's private area.

150.    For example, every time CARANDANG used the telephone in the bar area at the 13th Street Location, if ROBERT was at that location, he would walk by CARANDANG and grab CARANDANG's posterior.

151.    CARANDANG's office was located downstairs in the basement of the 13th Street Location.  ROBERT would regularly go to the 13th Street Location and when ROBERT arrived, he would shout to CARANDANG, "Bring your big butt up here."  When CARANDANG would go upstairs, ROBERT would grab his posterior and say "Good morning" or "Good afternoon."

152.    CARANDANG would frequently request ROBERT stop this behavior, but ROBERT would tell CARANDANG that "he knew he liked it."

153.    ROBERT engaged in a practice of belittling and humiliating CARANDANG, blaming CARANDANG for ROBERT's failure to pay vendors.

154.    ROBERT would also have CARANDANG refer to him as "Daddy."  This was reflected in dozens of e-mails from CARANDANG to "Daddy."

155.    This was all done by ROBERT or condoned by ROBERT.  ROBERT is the top person in the FLEX RESTAURANT GROUP and he refused to stop with the sexual contact or after being repeatedly told do so.

156.    CARANDANG's working conditions deteriorated to the point where some managers felt free to refer to CARANDANG as a "bitch" to other employees of the organization.

157.    On the morning of CARANDANG's termination on September 26, 2011, ROBERT told CARANDANG, in substance, that if CARANDANG filed any claim with any government agency or court against ROBERT and/or members of his family and/or any of his business organizations, CARANDANG "should be prepared to go back to jail."

158.    The FLEX DEFENDANTS did, in fact, cause a false police report to be filed, and CARANDANG was arrested.  As described in more detail, OFFICER MASSI then arrested CARANDANG with no probable cause, and the CITY OF NEW YORK through the New York City Police Department and New York County District Attorney's Office initiated and continued a criminal case against CARANDANG with no probable cause.

159.    CARANDANG suffered irreparable injury, mental anguish and humiliation as a result of Defendants' discriminatory acts and illegal practices.

160.    Defendants acted intentionally and with malice and/or reckless indifference to CARANDANG's statutory, constitutional and common-law rights.

## RETALIATION FACTS

161.    On or about October 13, 2011, counsel for CARANDANG, Richard Garbarini of GARBARINI FITZGERALD contacted Defendants' counsel, Richard Feldman of Rosenberg, Feldman and Smith by e-mail providing written notice of the FLSA violations described in this Second Amended Complaint.

162.    On October 18, 2011, Mr. Feldman responded by claiming the Defendants were engaged in an "investigation."  The October 18, 2011 e-mail from Richard Feldman is attached as **Exhibit C**.

163.    This was followed by an e-mail dated October 20, 2011 from Mr. Feldman claiming the Defendants were "investigating" an alleged "issuance and signing of checks from our client's business accounts.  Checks for significant amounts were made out by [CARANDANG] to cash or to himself and our client is reviewing whether these funds were properly deposited into the companies' bank accounts."

164.    The e-mail from Richard Feldman to Richard Garbarini dated October 20, 2011 is attached as **Exhibit D**.

165.    The FLEX DEFENDANTS at that time, and at all times, were well aware the checks to CARANDANG or to cash were not deposited into the companies' accounts. In fact, every check written to CARANDANG or to cash was authorized by ROBERT, ALEXANDRA, LAURA, Marco Andrade, Joseph Scalice, Zachary Young or Jennifer Gavino and used to make payments or give cash to LAURA and/or ALEXANDRA, pay Ira Garr, contractors, etc.

166.    The threat of an allegation of embezzlement was intended for the sole purpose of intimidating CARANDANG and forcing him to withdraw his rightful claims under the FLSA.

167.    CARANDANG had indeed previously been found guilty of embezzlement, and served just less than two years in jail, a fact known to ROBERT and LAURA from the day CARANDANG first interviewed to work for FLEX DEFENDANTS.

168.    ROBERT had mentioned CARANDANG's former incarceration on many occasions. Sometime in June or July of 2010 when Jackson Anderberg was hired as a chef, ROBERT said, "Here is another felon like you."

169.    In August of 2011, ROBERT was at the bar of FLEX DOWNTOWN when he received a criminal summons for a person unrelated to the FLEX DEFENDANTS's or anyone in the company, regarding restitution. ROBERT stated "This is about your [CARANDANG's] criminal history." This was said in front of Anthony Felzen.

170.    When FLEX DOWNTOWN was opening, the FLEX DEFENDANTS needed someone who could clean up from the construction. CARANDANG recommended Jose Gonzalez. ROBERT asked CARANDANG where he knew Gonzalez from, and CARANDANG responded "from jail."

171.    There came a time when Tom Kat Bakery sued the FLEX RESTAURANT GROUP, and ROBERT sent CARANDANG to pay off the bakery, saying "Since you know the criminal system, you should go there."

172.    Joseph Scalice, Director of Operations for FLEX RESTAURANT GROUP and Zachary Young, Pastry Chef of FLEX RESTAURANT GROUP asked CARANDANG on several occasions, "Were you raped in jail?"

173.    ROBERT's threat to fabricate a claim of embezzlement initially had no effect on CARANDANG, and he, through counsel, reiterated that he would be filing a case pursuant to the FLSA unless they could resolve the matter of the outstanding overtime pay.

174.    On December 8, 2011 counsel for Defendants reiterated that Defendants were investigating an alleged theft by CARANDANG and mysteriously claimed CARANDANG was not an employee.

175.    A true and correct copy of the e-mail from Richard Feldman dated December 8, 2011, to Richard Garbarini is attached as **Exhibit E**.  The e-mail from Mr. Feldman also confirms that Defendants were aware of CARANDANG's past and were using this to threaten him.

176.    Undeterred by the FLEX DEFENDANTS' threats, and with absolutely nothing to hide, CARANDANG filed a complaint in this Court entitled *Carandang v. Robert Shapiro, et al.*, 11-cv-8994 under the FLSA and State Law on December 9, 2011.  That Complaint was amended on December 15, 2011.

177.    On December 21, 2011, almost immediately after the Amended Complaint was served, LAURA, with the active participation of all Defendants, swore out a criminal complaint alleging "approximately one hundred fifty (150) checks drawn on the company account were all

made payable to the defendant." A true and correct copy of the criminal complaint is attached as **Exhibit F**. LAURA and the other Defendants knew this was a materially false statement when it was made.

178.    Not by coincidence, LAURA alleged the exact amount for the jurisdictional minimum for a Class C felony. LAURA and ALEXANDRA also lied that alleged checks were unauthorized, and CARANDANG.

179.    LAURA also swore that the "three signators on the account and which after examination were not in fact their signatures." This meant that LAURA swore CARANDANG signed the names of ROBERT, ALEXANDRA and Marco Andrade, without their permission and with the intent to defraud. This too is a materially false sworn statement made for the sole purpose of retaliating against CARANDANG for filing a complaint under the FLSA. At no time did CARANDANG ever sign the name of Andrade to any check drawn to himself or cash. At no time did CARANDANG ever sign the name of ALEXANDRA to any check drawn to himself or cash. CARANDANG did sign the name of ROBERT on checks drawn to himself or cash, but only with express permission, and at no time with the intent to defraud.

180.    LAURA and ALEXANDRA then repeated this malicious fiction to a grand jury.

181.    ALEXANDRA, ROBERT and LAURA conspired to submit a false and malicious criminal complaint, with no basis in fact, knowing that CARANDANG's freedom would be taken away.

182.    This vicious and evil attempt by the FLEX DEFENDANTS with the aid of OFFICER MASSI and the CITY OF NEW YORK to punish CARANDANG was planned to have CARANDANG sustain the toughest punishment possible; punishment for daring to file a wage-and-hour and EEOC complaint.

183.    CARANDANG was arrested at his home on December 21, 2011, and spent the next six days in jail, missing spending time with his family on Christmas.

184.    On December 27, 2011, before CARANDANG was released, Officers executed a search warrant at Plaintiffs' home, confiscating Plaintiffs' computers, an iPad and documents.

185.    The Officers executed the search warrant even after CARANDANG, through Counsel, stated he would voluntarily turn over all relevant documents and electronic files.

186.    CARANDANG was terrified and feared for his safety as the police entered his home; when he was taken in custody, and, for the six days he spent in jail.

187.    ROSARIO was traumatized and reduced to tears as officers executed a warrant based on the misstatements of LAURA.

188.    ROSARIO was terrified and feared for her safety as the police entered her home and arrested her husband; and when the police came back to execute a search warrant when she was alone in her home.

189.    ROSARIO was frozen in fear of her safety each time she heard a knock on the door.

190.    ROSARIO was in a very delicate physical condition at the time of the arrest.  On December 13, 2011 ROSARIO had major surgery.

191.    Immediately after CARANDANG's arrest, ROSARIO started to experience chest-pain, shortness of breath and rarely slept.

192.    These physical maladies continued until ROSARIO went the hospital on December 23, 2011 and was diagnosed with hypertension and prescribed medication.

193.    ROSARIO was also forced to humiliate herself and ask neighbors for money to pay the high bail that was set.

194.    LAURA knew when she swore out the statement that "CARANDANG wrote 150 checks totaling more than $50,000 to himself without permission and with the intent to defraud" the statement was a complete fabrication.  In fact, it is a complete impossibility.  On a daily basis, the online banking statement is reviewed by LAURA, ROBERT and William Lee.

195.    Every day an account alert is also sent to ROBERT indicating all withdrawals and checks posted.  Any discrepancy would immediately be found.

196.    Any check that is written to cash or to CARANDANG is questioned on a daily basis, and a reason and track for all funds must be provided by CARANDANG.

197.    ROBERT would also demand CARANDANG print out a check registry on a weekly basis.  The check registries contained the amount, payee, and the account details for the check.  Attached as **Exhibit G** is an e-mail from ROBERT to CARANDANG requesting the check registry be printed out for review.

198.    CARANDANG and ROBERT would then go through every check.

199.    At times CARANDANG would also have to go through the checks with LAURA and William Lee, the outside accountant.

200.    It was common practice for CARANDANG to sign checks because he worked downtown in a construction zone for much of his employment.  There simply were no authorized signors present when checks needed to be drawn.

201.    CARANDANG would routinely be directed to sign the name of  ALEXANDRA by ALEXANDRA herself to checks.  For example, on May 14, 2010, ALEXANDRA contacted CARANDANG by e-mail and demanded "JUST FAKE MY SIGNATURE."  A true and correct copy of the May 14, 2010 e-mail is attached as **Exhibit H**.

202.    On May 20, 2010, ALEXANDRA directed CARANDANG to "Forge dads sig. None of us will be there." A true and correct copy of the May 20, 2010 e-mail is attached as **Exhibit I**. This was a near every-day occurrence.

203.    Every dollar, however, that came in and went out of the FLEX RESTAURANT GROUP was closely monitored. Attached as **Exhibit J** are various e-mails showing the incredible scrutiny with which every transaction, no matter how small, was watched. CARANDANG was not allowed to make a single move without authorization. Attached as **Exhibit K** is an e-mail dated August 31, 2010, demonstrating how every movement of CARANDANG was questioned.

204.    In fact, the FLEX DEFENDANTS routinely did not pay invoices to their primary vendors, and watched every cent, paying only certain invoices, often after vendors threatened to sue, or cut off supply. The FLEX DEFENDANTS knew, at any given moment relative to this Second Amended Complaint, exactly where every cent in the organization was.

205.    The idea that 150 checks could somehow have "slipped" passed this scrutiny is absurd.

206.    In fact, each and every check, on a daily basis, was accounted for at the time of writing, can be accounted for now, and were authorized.

207.    A significant number of the checks drafted to CARANDANG went for cash to LAURA or cash to pay Ira Garr, a former partner at ZOCALO. On a weekly basis, from the time CARANDANG was hired, CARANDANG was instructed by Marco Andrade, with the knowledge and consent of ROBERT, to draft checks to cash or to CARANDANG which would then be used to pay partner Ira Gar $500. The checks would most often be for $800, with the

remaining $300 given to LAURA. Attached as **Exhibit L** are the signed receipts for the cash to
Ira Garr.

208.    The receipt of cash by LAURA is evidenced by an e-mail dated June 23, 2010
wherein LAURA states that she wanted $1,000 to pay her Citibank credit card and $300 for
another card. Tellingly, the e-mail closes with "I'm trying, Gilbert!!! SHHHHH!!!." A true and
correct copy of the June 23, 2010 e-mail from LAURA is attached as **Exhibit M**.

209.    In fact, LAURA and ALEXANDRA constantly called CARANDANG and
demanded that money from the various FLEX RESTAURANT GROUP accounts be deposited
into their personal accounts. Attached as **Exhibit N** are e-mail from LAURA and
ALEXANDRA requesting money for ALEXANDRA's rent.

210.    **Exhibit O** is an e-mail dated August 30, 2010 from LAURA regarding $3,000
being deposited by CARANDANG into LAURA's personal account.

211.    LAURA would also have CARANDANG wire money to her personal account in
Prince Edward Island at the Bank of Nova Scotia. Attached as **Exhibit P** is an e-mail from
LAURA directing CARANDANG to wire $2500 into her PEI account, as well as her personal
checking account.

212.    Some of the checks drafted by CARANDANG to himself or cash were also used
to get cash to pay off the contractor for FLEX DOWNTOWN, Ardian Paja, who demanded his
construction crew be paid in cash.

213.    Two of the checks drafted by CARANDANG to himself or cash were deposited
directly into ALEXANDRA's personal checking account while ALEXANDRA was in Florida.

214.    Numerous checks drafted by CARANDANG to himself or to cash were used to pay cash for tips, cash payments for overtime to staff members, deposits for PEI artwork, cash payment to Dorene Winkler, ROBERT's personal electrical bill, and payments to the bar back.

215.    At least twenty-five checks drafted by CARANDANG to himself or cash went directly to Joseph Scalice.

216.    At least six checks were drafted by CARANDANG to himself or to cash for reimbursement for expenses of office supplies.

217.    Every check to CARANDANG or cash was reviewed by ROBERT, LAURA, Melinda Cedeno or William Lee, in their daily on-line review.  The Defendants, at all times, knew there were no monies being stolen by CARANDANG.

218.    ROBERT, LAURA and William Lee would also pay particular attention to transactions labeled "IM Withdrawal."  An IM Withdrawal is an immediate withdrawal check negotiated over the counter.

219.    Other employees also cashed checks to themselves for the benefit of the FLEX RESTAURANT GROUP or the individual defendants.  For example, attached as **Exhibit Q** is an e-mail from Josaphat Rodriguez, Manager of FLEX UPTOWN, stating "I'm going to cashed them on my name and give him the cash."

220.    As described herein, it was LAURA, ROBERT and ALEXANDRA who looted the companies, and used CARANDANG as a pawn.

221.    The FLEX DEFENDANTS went even further in retaliation, attempting to recall, and actually recalling, other checks written by the FLEX DEFENDANTS to compensate CARANDANG for his work.

222.    CARANDANG had kept multiple pay-checks, uncashed, because he was directed by ROBERT to hold them until there were funds in the accounts. This was not something new, ROBERT frequently requested checks be held because they would bounce. The FLEX DEFENDANTS had previously bounced checks to employees.

223.    The FLEX DEFENDANTS also retaliated against CARANDANG by opposing his unemployment on the ground he was dismissed for cause and stole from the company—facts the FLEX DEFENDANTS knew to be false.

224.    Retaliation is nothing new to the FLEX DEFENDANTS. The FLEX DEFENDANTS have made statements that they will seek to retaliate against any employee that files a matter under the FLSA or New York Labor Law. Attached as **Exhibit R** is an e-mail from Defendant ALEXANDRA after Raphael Bernitt filed an action in this Court under the FLSA and New York Labor Law stating:

> "hi!!! do you have the addresses for rafael the dude suing us and for ricky the line cook uptown?
>
> im gonna call immigration mooohahahahahahahahahahahah."

225.    After CARANDANG refused to file false invoices to the FLEX DEFENDANTS insurance carrier, ALEXANDRA threatened CARANDANG that she would call immigration on CARANDANG.

## THE BOGUS CRIMINAL CASE

226.    ROBERT made good on his threat to have CARANDANG arrested if he filed a complaint.

227.    Upon information and belief, Defendant LAURA has connections with the New York District Attorney's Office, and called in "a favor" in order to have CARANDANG

arrested.  Attached as **Exhibit S** is an e-mail from LAURA to Intuit dated May 7, 2010, threatening "I have a family of attorneys, and if necessary can call in a favor."

228.    On December 9, 2011 the Complaint in the matter *Carandang v. Shapiro*, 11-cv-894 and was served on the FLEX DEFENDANTS on or about December 11, 2011.  The First Amended Complaint was filed on December 13, 2011 and served on Defendants on or about December 17, 2011.

229.    On or about December 21, 2011, LAURA, on behalf of all Defendants caused a false police report to be filed; the only evidence offered by LAURA was a spreadsheet purporting to be 150 checks to CARANDANG totaling $50,000.

230.    On December 21, 2011, OFFICER MASSI interviewed LAURA, and based solely upon LAURA's statements, and the spreadsheet provided by LAURA, went to Plaintiffs' home and arrested CARANDANG.

231.    On December 21, 2011, Assistant District Attorney Sharon Appelbaum, based solely on the representations LAURA made to OFFICER MASSI, caused to be filed the felony criminal complaint against CARANDANG.

232.    On December 22, 2011, rather than seek corroboratory evidence, ADA Appelbaum requested LAURA, ALEXANDRA and ROBERT come to her office with the spreadsheet provided to Officer MASSI.

233.    On December 22, 2011, rather than seek corroboratory evidence, ADA Appelbaum stated "I was hoping that you could create a few more columns on that [the spreadsheet] since that is basically what you will be explaining to the Grand Jury."  Attached as **Exhibit T** is the December 22, 2011 e-mail from Appelbaum to LAURA.

234. There was *zero* due diligence on the part of OFFICER MASSI or ADA Appelbaum, beyond the statement of LAURA and the spreadsheet prepared by LAURA.

235. There was *zero* due diligence on the part of ADA Appelbaum, before the New York County District Attorney's Office requested $15,000 in bail, knowing CARANDANG did not have the resources to pay that, or almost any, amount.

236. ADA Applebaum was, from the start, consistently aggressive and evasive when asked to discuss the case.

237. ADA Applebaum fought the simple issue of surety, refusing to accept ROSARIO's proof of income.

238. Plaintiffs were able to secure a loan from their 87 year old neighbor Stanley O'Dell. ADA Appelbaum made Mr. O'Dell, come to Appelbaum's office to show proof of income before Appelbaum lifted the surety.

239. Mr. O'Dell an 87-years-old home-bound man was forced to personally go to the Assistant District Attorney's Office in Lower Manhattan before the surety would be lifted.

240. The only imaginable purpose for requiring an 87 year old man to travel from his home in Fresh Meadows, Queens to Lower Manhattan was to keep CARANDANG in custody longer.

241. Appelbaum also directed the execution of a search warrant even after it was made clear by counsel that CARANDANG would voluntarily turn over any and all relevant documents.

242. On December 27, 2011, Officers again showed up at Plaintiffs' residence and searched the home while ROSARIO fearfully cowered and cried. The Officers then confiscated ROSARIO's laptop, an iPad and paper documents found throughout the home.

243.    In a phone call to Andrew Whitcup of the Legal Aid Society, in late June or early July of 2011, Appelbaum asked if "CARANDANG would be willing to plead guilty to an SCI" (Superior Court Information), which is a way of pleading to a felony without being indicted.

244.    ADA Appelbaum made this offer despite knowing at that time she wouldn't be able to prove the case.

245.    The bogus case against CARANDANG was dismissed shortly after the offer by ADA Appelbaum was made.

246.    As of the date of this Second Amended Complaint, neither ROSARIO nor CARANDANG have been able to get their belongings from the New York District Attorney's Office.

247.    Defendants acted jointly in charging CARANDANG with PL155.40(1) Grand Larceny in the Second Degree (I Count); PL190.80(4) Identity Theft in the First Degree (1 Count; PL190.80(3) Identity Theft in the First Degree (1 Count); and, Pl170.25 Criminal Possession of a Forged Instrument in the Second Degree (1 Count).

248.    CARANDANG faced up to ten years in prison for the assortment of Class C and D felonies leveled against him.

**OTHER INSTANCES OF THE FLEX DEFENDANTS' FRAUDULENT BEHAVIOR**

249.    The FLEX DEFENDANTS have also engaged in other schemes to falsify documents and information for their benefit.

250.    ALEXANDRA submitted an application for the apartment where she currently resides, supported by fake tax returns for LAURA and ROBERT for tax years 2008, 2009 and 2010 which materially differ from the tax returns actually filed with the Internal Revenue Service.

37

251.    The FLEX DEFENDANTS, engaged in a scheme to obtain insurance proceeds related to a March of 2011 fire at FLEX UPTOWN by submitting fraudulent, and inflated, invoices to Traveler's Insurance.

252.    From at least February of 2010 through September of 2011, Defendants LAURA, ALEXANDRA, and the FLEX RESTAURANT GROUP caused the weekly changing of employee time records to eliminate overtime.

253.    Defendants ROBERT and LAURA responded to a Request for Proposal related to the rental space for Defendant ZOCOLO which contained materially false information— information ROBERT and LAURA knew was false when the Request for Proposal was responded to the New York Metropolitan Transportation Authority.

254.    Defendants changed the lawful tax deductions of employees, without the employees' consent, in order to reduce payroll taxes.

## FIRST CAUSE OF ACTION
*(Fair Labor Standards Act – Failure to Pay Overtime)*
(Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

255.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

256.    The FLEX DEFENDANTS, and each of them, were engaged in a widespread pattern and practice of violating the FLSA, as detailed in this Second Amended Complaint.

257.    At all times relevant, CARANDANG was engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

258.    The overtime wage provisions set forth in §§ 201 *et seq*. of FLSA apply to each of the FLEX DEFENDANTS.

259.    The FLEX DEFENDANTS are employers engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

260.    The FLEX DEFENDANTS have failed to pay CARANDANG the overtime wages to which he was entitled under FLSA.

261.    The FLEX DEFENDANTS' violations of the FLSA, as described in this Second Amended Complaint, have been willful and intentional.  The FLEX DEFENDANTS have not made a good faith effort to comply with FLSA with respect to its compensation of CARANDANG.

262.    Because the FLEX DEFENDANTS' violations of FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

263.    As a result of the FLEX DEFENDANTS willful violations of FLSA, CARANDANG has suffered damages by being denied overtime wages in accordance with 29 U.S.C. §§ 201 *et seq*.

264.    As a result of the unlawful acts of the FLEX DEFENDANTS, CARANDANG has been deprived of overtime compensation and other wages in amounts to be determined at trial, and is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
*(New York Labor Law: Unpaid Overtime Wages and Spread-of-Hours Pay)*
(Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

265.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

266.    At all times relevant to this action, CARANDANG was an employee, and each of the FLEX DEFENDANTS was an employer within the meaning of the New York Labor Law.

267.    The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to each of the FLEX DEFENDANTS.

268.    The FLEX DEFENDANTS, and each of them, have failed to pay CARANDANG the overtime wages to which he was entitled under the New York Labor Law.

269.    By the FLEX DEFENDANTS', and each of their, failure to pay CARANDANG overtime wages for hours worked in excess of 40 hours per week, the FLEX DEFENDANTS have willfully violated the New York Labor Law Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

270.    Due to the FLEX DEFENDANTS' violations of the New York Labor Law, CARANDANG is entitled to recover from the FLEX DEFENDANTS his unpaid overtime wages and spread-of-hours wages, reasonable attorneys' fees and costs of the action, pre-judgment and

post-judgment interest, liquidated damages, and other relief pursuant to New York Labor Law Article 19, §§ 650 *et seq.*

**THIRD CAUSE OF ACTION**
*(Unpaid Compensation under N.Y. Labor Law §190 et seq.)*
(Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

271.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

272.    As described above, each of the FLEX DEFENDANTS failed to pay Plaintiff CARANDANG the straight-time compensation owed to him under the New York Labor Law.

273.    The FLEX DEFENDANTS did not act in good faith in failing to pay CARANDANG the compensation due to him.

274.    Plaintiff CARANDANG was damaged through the loss of this income.

275.    Due to the FLEX DEFENDANTS' violations of the New York Labor Law, CARANDANG is entitled to recover from the FLEX DEFENDANTS his unpaid wages for all hours worked, costs of the action, pre-judgment and post-judgment interest, liquidated damages, and other relief pursuant to New York Labor Law Article 19, §§ 650 *et seq.*

**FOURTH CAUSE OF ACTION**
*(Quantum Meruit)*
(Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

276.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

277.    Throughout his tenure with the FLEX DEFENDANTS, Plaintiff CARANDANG worked diligently and successfully.

278.    CARANDANG always worked with a reasonable expectation that he would be paid reasonable compensation for his work.

279.    The FLEX DEFENDANTS failed to pay CARANDANG the reasonable compensation owed to him.

280.    CARANDANG was damaged through the loss of this income in an amount to be determined at the trial of this action.

## FIFTH CAUSE OF ACTION
*(Fair Labor Standards Act – Retaliation)*
(Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

281.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

282.    At all relevant times, CARANDANG was engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

283.    The retaliation provisions set forth in Section 15(a)(3) of the FLSA apply to the FLEX DEFENDANTS.

284.    As described herein, the FLEX DEFENDANTS engaged in an intentional and malicious pattern of retaliating against CARANDANG in the harshest way possible.

285.    Defendants ROBERT, LAURA, ALEXANDRA, individually and on behalf of the FLEX RESTAURANT GROUP, caused a false and malicious police report to be filed resulting in the arrest and imprisonment of CARANDANG.

286.    All FLEX DEFENDANTS caused CARANDANG's pay to be recalled and checks cancelled due to CARANDANG filing a written claim for unpaid wages.

287.    All FLEX DEFENDANTS made material misrepresentations to the New York District Attorney's Office, Unemployment Board and New York City Police Department.

288.    As a result of the FLEX DEFENDANTS' unlawful acts, CARANDANG is entitled to recover his back-pay, front-pay, punitive damages, compensatory damages, prejudgment interest, attorneys' fees and costs.

### SIXTH CAUSE OF ACTION
*(Intentional Infliction of Emotional Distress)*
(Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

289.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

290.    In a particularly vicious act of retaliation, Defendants ROBERT, LAURA, ALEXANDRA and the FLEX RESTAURANT GROUP intentionally conspired to have CARANDANG arrested under false pretenses.

291.    The FLEX DEFENDANTS' conduct as described herein was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

292.    By falsely and maliciously asserting that CARANDANG impersonated the Defendants ROBERT, ALEXANDRA and FLEX employee Marco Andrade; falsely claiming CARANDANG conspired, and in fact succeeded, in stealing property valued at more than $50,000; falsely claiming that from February 2010 through October of 2011 CARANDANG falsified approximately 150 checks with the intent to defraud Defendants; providing false information, and misrepresenting and falsifying evidence, to the NYPD and Manhattan District Attorney's Office; and by providing false testimony to the grand jury, the FLEX DEFENDANTS intended to cause CARANDANG emotional distress.

293.    As a direct and foreseeable result of the FLEX DEFENDANTS' actions, CARANDANG feared for their physical safety.  CARANDANG was afraid for his physical

safety and well-being when the police arrived to arrest CARANDANG.  CARANDANG feared

for his physical safety while he was incarcerated in jail.

294.    The FLEX DEFENDANTS, and in particular LAURA, took the foregoing actions

with the reckless disregard of the probability that doing so would cause emotional distress to

CARANDANG.

295.    The FLEX DEFENDANTS intentionally acted as stated here knowing their

actions would cause emotional distress to CARANDANG.

296.    As a direct and foreseeable result of the FLEX DEFENDANTS' actions,

CARANDANG has suffered severe emotional distress and actual damages in an amount to be

determined at trial, and is also entitled to punitive damages as may be assessed by the jury.

### SEVENTH CAUSE OF ACTION
*(Negligent Infliction of Emotional Distress)*
(Against the FLEX DEFENDANTS by Plaintiffs)

297.    Plaintiffs reallege and incorporate by reference all allegations in all preceding

paragraphs.

298.    The FLEX DEFENDANTS' conduct as described herein was so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized society.

299.    ROSARIO was also forced to endure a police search of her home.

300.    As a direct and foreseeable result of the FLEX DEFENDANTS' actions,

CARANDANG and ROSARIO feared for their physical safety.  CARANDANG and ROSARIO

were afraid for his physical safety and well-being when the police arrived to arrest

CARANDANG.  CARANDANG feared for his physical safety while he was incarcerated in jail.

301.    ROSARIO feared for her physical safety as Police Officers again knocked on her door, invaded her home, and confiscated her belongings without reasonable cause.

302.    ROSARIO suffered physical ailments, including high-blood pressure, was forced to see a physician and suffered severe emotional injuries as a direct and consequential result of the FLEX DEFENDANTS' acts.

303.    Plaintiffs suffered severe emotional injuries as a direct and consequential result of the FLEX DEFENDANTS' acts.

304.    As a direct and foreseeable result of the FLEX DEFENDANTS' actions, CARANDANG and ROSARIO have suffered, and will continue to suffer, severe emotional distress and actual damages in an amount to be determined at trial and are also entitled to punitive damages as may be assessed by the jury.

## EIGTH CAUSE OF ACTION
### (*Malicious Prosecution*)
### (Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

305.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

306.    Defendants ROBERT and ALEXANDRA made material misrepresentations, claiming they did not sign certain checks and/or those checks were signed by CARANDANG.

307.    At no time did CARANDANG ever sign the name of Marco Andrade or ALEXANDRA to a check drawn to him or to cash.

308.    CARANDANG did sign the name of ROBERT to checks to himself or cash, but only after CARANDANG was directed to sign ROBERT's name.

309.    ROBERT, LAURA, ALEXANDRA and the FLEX RESTAURANT GROUP participated in the commencement and maintenance of a baseless criminal prosecution of

CARANDANG beginning on December 21, 2011.  The FLEX DEFENDANTS played an active role in the criminal prosecution of CARANDANG by, inter alia, providing false information, and misrepresenting and falsifying evidence, to the NYPD and the Manhattan District Attorney's Office, thereby importuning those authorities to arrest and incarcerate CARANDANG and arraign him on a criminal complaint based on the false allegation that CARANDANG had forged 150 checks with the intent to defraud, when the FLEX DEFENDANTS knew such allegation to be untrue.

310.    Upon information and belief, Defendant LAURA has connections with the New York District Attorney's Office, and called in "a favor" in order to have CARANDANG arrested.

311.    CARANDANG did sign the name of ROBERT to checks drawn to himself or cash, but only after CARANDANG was directed to sign ROBERT's name.

312.    The criminal prosecution of CARANDANG was terminated in his favor on July 17, 2012, when the Criminal Court granted the motion of CARANDANG's counsel to dismiss the criminal complaint.  There can be no further proceedings upon the dismissed complaint.

313.    The FLEX DEFENDANTS acted without cause in the commencement and maintenance of the criminal prosecution of CARANDANG.  The FLEX DEFENDANTS provided false information, and misrepresented and falsified evidence, to the NYPD and the Manhattan District Attorney's Office.

314.    The FLEX DEFENDANTS acted with actual malice in connection with the commencement and maintenance of the criminal prosecution of CARANDANG, and in so doing intended to injure CARANDANG.

315.   As a direct and foreseeable result of the FLEX DEFENDANTS' malicious prosecution of CARANDANG, he has suffered actual damages in an amount to be determined at trial, and also is entitled to punitive damages as may be assessed by the jury.

## NINTH CAUSE OF ACTION
*(Abuse of Process)*
(Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

316.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

317.   ROBERT, LAURA, ALEXANDRA and the FLEX RESTAURANT GROUP caused criminal process to be issued against CARANDANG by intentionally, falsely and maliciously asserting that CARANDANG had committed various crimes, when the FLEX DEFENDANTS knew those accusations to be untrue.

318.   The FLEX DEFENDANTS intended to harm CARANDANG without excuse or justification.

319.   The FLEX DEFENDANTS manipulated process to obtain a collateral objective.

320.   As a direct and foreseeable result of the FLEX DEFENDANTS' abuse of process, CARANDANG has suffered actual damages in an amount to be determined at trial, and also is entitled to punitive damages as may be assessed by the jury.

## TENTH CAUSE OF ACTION
*(False Imprisonment)*
(Against the FLEX DEFENDANTS by Plaintiff CARANDANG)

321.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

322.   Defendants ROBERT, LAURA, ALEXANDRA and the FLEX RESTAURANT GROUP intended to confine CARANDANG by intentionally, falsely and maliciously asserting that CARANDANG had committed various crimes.  Defendants played an active role in, and caused the confinement of, CARANDANG by, inter alia, providing false information, and

misrepresenting and falsifying evidence, to the NYPD and the Manhattan District Attorney's Office, thereby importuning those authorities to arrest and incarcerate CARANDANG and arraign him on a criminal complaint based on Defendants' false allegation, when they knew such allegation to be untrue.  LAURA also made the same false accusation, under oath.

323.    As a result of Defendants' actions, CARANDANG was incarcerated and he was at all times conscious of his confinement.

324.    CARANDANG did not consent to his confinement.

325.    CARANDANG's confinement was not privileged.

326.    As a direct and foreseeable result of Defendants' false imprisonment of CARANDANG, he has suffered actual damages in an amount to be determined at trial, and also is entitled to punitive damages as may be assessed by the jury.

### ELEVENTH CAUSE OF ACTION
*(Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. –*
*Hostile Work Environment)*
(Against the ROBERT and the FLEX RESTAURANT GROUP by Plaintiff CARANDANG)

327.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

328.    By the acts described herein ROBERT and the FLEX RESTAURANT GROUP created a hostile environment in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000e et seq.

329.    The harassment described herein was sufficiently severe or pervasive to alter the conditions of the CARANDANG's employment and created an abusive working environment.

330.    The incidents of harassment described herein were more than episodic; they were sufficiently continuous and concerted in order to be deemed pervasive.

331.    CARANDANG has been injured in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
*(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. – Retaliation)*
(Against ROBERT and the FLEX RESTAURANT GROUP by Plaintiff CARANDANG)

332.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

333.    By the acts described herein ROBERT and the FLEX RESTAURANT GROUP retaliated against Plaintiff in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. in an amout to be determined at the trial of this action.

334.    The retaliation herein was committed with the knowledge, consent and on behalf of ROBERT and the FLEX RESTAURANT GROUP in direct response to CARANDANG filing charges of discrimination against FLEX DEFENDANTS.

335.    CARANDANG has been injured in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
*(42 U.S.C. § 1983 – False Arrest)*
(Against Defendant OFFICER MASSI by Plaintiff CARANDANG)

336.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

337.    MASSI had no legal authority to arrest CARANDANG.

338.    On the aforesaid date, time and place, MASSI knew or should have known that the aforesaid statements provided were false.

339.    As a result of the aforesaid arrest, CARANDANG suffered a deprivation of his liberty in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

340.    Defendant MASSI arrested  CARANDANG without probable cause and with actual malice.

341.   All of the aforesaid criminal charges were resolved and dismissed with prejudice on July 17, 2011.

342.   CARANDANG was arrested notwithstanding the fact that it would jeopardize CARANDANG's liberty, safety and well-being.

343.   All of the foregoing was a proximate cause of the injuries to CARANDANG.

344.   By and through the foregoing, Defendants falsely arrested CARANDANG.

345.   Defendants MASSI's actions violated Plaintiff CARANDANG's clearly established civil rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution including but not limited to the right to due process, the right not to be unreasonably seized, the right not to be falsely arrested, the right not to be prosecuted with the use of fabricated evidence, the right not be arrested and imprisoned without probable cause, and defendants further maliciously prosecuted CARANDANG, subjected him to abuse of process, denied him his due process, and unreasonable seized CARANDANG and violated his civil and constitutional rights.

346.   Defendants MASSI's actions shock the conscience.

347.   No reasonable officer in the position of Defendant MASSI would have believed the actions of the defendants herein were objectively reasonable.

348.   As a direct and proximate result of the foregoing acts committed by the MASSI, CARANDANG's liberty was constrained in that he was incarcerated for approximately six days, that he was subjected to limitations on his freedom, and that he was forced to endure harassment, humiliations, hardships and inhumanities associated with arrest and incarceration.

349.   CARANDANG has been injured by the aforesaid acts in an amount to be determined at the trial of this action.

## FOURTEENTH CAUSE OF ACTION
*(42 U.S.C. § 1983 – Malicious Prosecution)*
(Against Defendant CITY OF NEW YORK by Plaintiff CARANDANG)

350.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

351.    Defendants MASSI's and CITY OF NEW YORK's actions violated Plaintiff CARANDANG's clearly established civil rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution including but not limited to the right to due process, the right not to be unreasonably seized, the right not to be falsely arrested, the right not to be prosecuted with the use of fabricated evidence, the right not be arrested and imprisoned without probable cause, and defendants further maliciously prosecuted CARANDANG, subjected him to abuse of process, denied him his due process, and unreasonable seized CARANDANG and violated his civil and constitutional rights.

352.    As a direct and proximate result of the foregoing acts committed by the defendants, CARANDANG's liberty was constrained, consistent with the concept of seizure, in that he was incarcerated for approximately six days, that he was subjected to limitations on his freedom, and that he was forced to endure harassment, humiliations, hardships and inhumanities associated with arrest and incarceration.

353.    Defendant CITY OF NEW YORK initiated a criminal prosecution against CARANDANG, without probable cause to believe it could proceed and with malice.

354.    Defendant CITY OF NEW YORK continued a criminal prosecution against CARANDANG, after acquiring knowledge that there was no probable cause to move forward.

355.    Malice on the part of the CITY OF NEW YORK can be inferred by its actions.

356.    All of the aforesaid criminal charges were resolved and dismissed with prejudice on July 17, 2011.

357.    CARANDANG has been injured by the aforesaid acts in an amount to be determined at the trial of this action.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief from each of the Defendants, ROBERT SHAPIRO, LAURA SHAPIRO, ALEXANDRA SHAPIRO, WHEN IT'S CHILE IT'S HOT, INC. d/b/a FLEX MUSSELS, PEI MUSSEL KITCHEN, LLC d/b/a FLEX MUSSELS, GRAND CENTRAL ZOCALO, LLC d/b/a ZOCALO, OFFICER MASSI and CITY OF NEW YORK jointly and severally:

A.  An Award against the FLEX DEFENDANTS to CARANDANG of his unpaid wages and an additional and equal amount as liquidated damages pursuant to 29 U.S.C. §§ 201 *et seq*. along with the attorneys' fees and costs of this action;

B.  An Award against the FLEX DEFENDANTS to CARANDANG's unpaid overtime, spread-of-hours pay and liquidated damages pursuant to N.Y. Lab. Law Article 19, §§ 650 *et seq*., and the supporting New York State Department of Labor regulations along with the attorneys' fees and costs of this action;

C.  An Award against the FLEX DEFENDANTS to CARANDANG's unpaid wages, pre-judgment and post-judgment interest, liquidated damages, and other relief pursuant to New York Labor Law Article 19, §§ 650 *et seq*.

D.  An Award against the FLEX DEFENDANTS to CARANDANG in *quantum meruit* for unpaid wages.

52

E.  An Award against the FLEX DEFENDANTS to CARANDANG's back-pay, front-pay, punitive damages, compensatory damages, prejudgment interest, attorneys' fees and costs pursuant to §15(a)(3) of the FLSA;

F.  An Award of actual and punitive damages against all the FLEX DEFENDANTS to CARANDANG on the Sixth Cause of Action in an amount to be determined at trial;

G.  An Award of actual and punitive damages against the FLEX DEFENDANTS to CARANDANG and ROSARIO on the Seventh Cause of Action in an amount to be determined at trial;

H.  An Award of actual and punitive damages against the FLEX DEFENDANTS to CARANDANG on the Eighth, Ninth, Tenth, Eleventh and Twelfth Causes of Action in an amount to be determined at trial;

I.  An Award of actual and punitive damages against OFFICER MASSI on the Thirteenth Cause of Action in an amount to be determined at trial;

J.  An Award of actual damages against CITY OF NEW YORK on the Fourteenth Cause of Action in an amount to be determined at trial;

K.  Pre-judgment interest and attorneys' fees;

L.  Such other relief as this Court shall deem just and proper.

Dated:  New York, New York
        October 26, 2012

                                        Respectfully submitted,


                                        GARBARINI FITZGERALD P.C.


                                        By:
                                        Richard M. Garbarini (RG 5496)
                                        rgarbarini@garbarinilaw.com
                                        Thomas FitzGerald (TF 2426)
                                        tfitzgerald@garbarinilaw.com
                                        Latrisha Desrosiers (LD 6971)
                                        tdesrosiers@garbarinilaw.com
                                        420 Lexington Ave.
                                        Suite 2743
                                        New York, New York 10170
                                        Telephone: (212) 300-5358
                                        Facsimile: (888) 265-7054


                                        *Attorneys for Plaintiffs*

# Exhibit A

# (Notice of Right to Sue)

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Gilbert S. Carandang**
     **78-10 160th Street**
     **Fresh Meadows, NY 11366**

From:  **New York District Office**
       **33 Whitehall Street**
       **5th Floor**
       **New York, NY 10004**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| **520-2012-00559** | **Hernan Morales,** **Investigator** | **(212) 336-3782** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On Behalf of the Commission

*Kevin Berry*

**Kevin J. Berry,**
**District Director**

6/25/12

(Date Mailed)

Enclosures(s)

cc:    **Attn**
       **Director of Human Resources**
       **FLEX MUSSELS LLC, Robert Shapiro, When It's Chile It's**
       **Hot, Inc., Grand Central Zocalo LLC; PEI Mussel Kitchen**
       **LLC; and Warren Business Services.**
       **154 W. 13th Street**
       **New York, NY 10011**

Enclosure with EEOC
Form 161 (11/09)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office. If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**Exhibit B**

**(e-mail from Laura dated June 8, 2011 to CARANDANG)**